IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN KUHNS, et al        :
                            :      CIVIL ACTION
                            :
          v.                   :
                            :
CITY OF ALLENTOWN, et al      :      NO. 08-2606

## MEMORANDUM AND ORDER

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE

In this action, three anti-abortion protesters ("Plaintiffs") allege that Defendants
Allentown Women's Center and its executive director, Jennifer Boulanger (collectively
"AWC"), conspired with Defendants City of Allentown and Police Chief Roger MacLean
(collectively "City Defendants") to violate Plaintiffs' constitutional and statutory rights to
communicate religious and political anti-abortion messages to AWC patients. Presently
before the court is a motion for a protective order filed by AWC (Doc. 57), Plaintiffs'
response thereto (Doc. 58), AWC's reply (Doc. 59), Plaintiffs' sur-reply (Doc. 61), and
arguments presented at oral argument conduced on January 22, 2010. For the following
reasons, I will grant the motion in part and deny it in part.[1]

---

[1] The Honorable James Knoll Gardner has referred all discovery-related issues in
this case to the undersigned.

# I.   **FACTS AND PROCEDURAL HISTORY**

The various parties in this case have a long adversarial history, some of which bears directly upon the present lawsuit and the pending motion. A brief discussion of this history is therefore necessary for purposes of historical context.

AWC provides reproductive health and abortion services at its facility in Allentown. The public entrance to AWC is located on a narrow roadway known as Keats Street. The present case follows two previous federal civil rights lawsuits by anti-abortion protesters against the City and its police department stemming from confrontational protests in the vicinity of the AWC entrance. See Arietta v. City of Allentown ("Arietta I"), No. 04-0226 (E.D. Pa.); Arietta v. City of Allentown ("Arietta II"), No. 04-5306 (E.D. Pa.). Two of the three plaintiffs in the present case, Kathleen R. Kuhns and Kathleen Teay, were also plaintiffs in Arietta II; Kuhns was also a plaintiff in Arietta I. The City and various police officials were named as defendants in both previous cases, while neither AWC nor Boulanger was a party in either case.

In resolving Arietta II, the parties entered into a Consent Agreement which created detailed rules governing the conduct of police and protesters around the AWC entrance. See Consent Agreement, attached to Doc. 25 at Ex. A; Complaint at ¶¶ 25, 29, 30-31 (discussing Consent Agreement). Among other things, the Consent Agreement created a seven-foot-wide crosswalk spanning Keats Street connecting the AWC parking lot and entrance, as well as a four-foot-wide painted walkway running the length of Keats Street

2

adjacent to the AWC parking lot, perpendicular to the seven-foot-wide crosswalk. See id. The Consent Agreement provided that anti-abortion protesters could use the walkway and crosswalk, but had to withdraw from the crosswalk whenever a patient, staffer, volunteer or other person affiliated with AWC elected to use the crosswalk. See Consent Agreement at ¶ 2 h. The Consent Agreement further provided that the protesters could walk back and forth across Keats Street to engage in pro-life advocacy whenever AWC-related persons used the crosswalk, but that non-consensual physical contact was prohibited. See id. at ¶ 2 i.

AWC attempted to intervene in Arietta II upon learning of the broad terms of the Consent Agreement, arguing that the agreement was potentially harmful to its patients and could threaten the security of its staff and volunteers. Both the plaintiff-protesters and the City Defendants opposed AWC's motion to intervene in Arietta II and, following briefing and argument, Judge Gardner denied the motion. See Arietta II, Doc. 235 (E.D. Pa. July 12, 2007); see also Complaint at ¶ 31.[2]

On June 4, 2008, Plaintiffs commenced the present lawsuit, alleging that AWC and the City Defendants conspired to deprive them of their civil and constitutional rights in

---

[2]In his opinion denying AWC's motion to intervene in Arietta II, Judge Gardner explained that the settlement agreement in Arietta II "does not compel employees, patients or visitors of [AWC] to utilize the designated crosswalk. Those affiliated with the [AWC] are free to seek passage across Keats Street in either direction in any manner they choose." Arietta II, Doc. 235 at 42 (E.D. Pa. July 12, 2007).

circumvention of the <u>Arietta II</u> Consent Agreement. Specifically, Plaintiffs allege that the City Defendants authorized the AWC to violate their civil and constitutional rights by (a) using tarps to escort persons across Keats Street from the parking lot to the AWC entrance, thus preventing Plaintiffs from communicating their anti-abortion message; (b) employing individuals to form a "human shield" around expectant mothers in order to "body block" Plaintiffs in a public place; and (c) using noise to drown out Plaintiffs' anti-abortion communications. Based on these activities, Plaintiffs asserted claims under 42 U.S.C. § 1983 for violation of their rights to freedom of speech and religion under the First and Fourteenth Amendments (Count I), under section 1983 and the Pennsylvania Constitution for violation of their rights to religious freedom and expression (Count II), under section 1983 for violation of their equal protection rights under the United States and Pennsylvania Constitutions (Count III), and a private action for public nuisance under state law (Claim IV).

By Opinion and Order dated March 31, 2009, Judge Gardner granted Defendants' motion to dismiss as to Counts II and III in their entirety, but denied the motion as to Counts I and IV. <u>See</u> Doc. 25. As a result, all of Plaintiffs' First Amendment and state nuisance claims survived and remain in the case.[3]

---

[3]On August 20, 2009, in light of the Supreme Court's opinion in <u>Ashcroft v. Iqbal</u>, – U.S. –, 129 S. Ct. 1937 (2009), AWC filed a motion asking Judge Gardner to reconsider those portions of the motion to dismiss which were denied. The motion to reconsider remains pending.

On September 11, 2009, Plaintiffs issued interrogatories and document production requests on Defendants. According to AWC, on October 23, 2009, AWC's counsel conferred with Plaintiffs' counsel concerning AWC's request for a protective order, and Plaintiffs' counsel stated that he would not agree to limit his clients' use of the documents to this litigation or to any confidentiality provisions. See Doc. 57 at 3-4.

Consistent with Judge Gardner's informal discovery dispute resolution procedures, Plaintiffs sent a letter to me dated November 12, 2009, asking the court to address concerns regarding Defendants' answers to these discovery requests. AWC responded to the letter, and I held a teleconference with counsel on November 20, 2009, during which I heard argument and ruled on each of the discovery disputes raised in Plaintiffs' letter.[4] I memorialized these rulings by Order dated November 20, 2009. During the teleconference it became clear that AWC's principal argument was that it was entitled to a protective order limiting Plaintiffs' use of the information. In my Order dated November 20, 2009, I directed AWC to file its already-prepared motion for a protective order by November 23, 2009. See Doc. 56.[5]

_____

[4]As stated by defense counsel during the teleconference and memorialized in my November 20, 2009, Order, AWC withdrew it assertion of a "confidential security" privilege related to the items sought by Plaintiffs in discovery, see Doc. 56 at 2, and instead seeks to preclude discovery by way of this motion for a protective order.

[5]Additionally, because the City Defendants failed to respond to Plaintiffs' discovery requests in any way, I ordered them to do so no later than November 30, 2009. See Doc. 56. The City Defendants have not joined the present motion for a protective order or filed such a motion separately. Nor did AWC's motion seek a protective order as to the City Defendants' production. Therefore, this memorandum and order is limited to

5

AWC filed the present motion on November 23, 2009, and, following the submission of responsive briefs, I issued an Order scheduling oral argument for January 22, 2010, and directing AWC to compile and submit to the Court and opposing counsel an index of all materials it had identified as subject to discovery in light of my November 20, 2009, Order. AWC thereafter submitted to me and counsel an "Index of [AWC's] Documents in Response to Plaintiffs' Request for Production" ("Index"), identifying numerous documents and e-mails, as well as one group of photographs (dated 09/16/08) and four videos.

## II.   TIMELINESS OF THE MOTION

As an initial matter, Plaintiffs argue that the present motion for a protective order is untimely because AWC failed to seek a protective order before the time for compliance with discovery. See Doc. 58 at 8. Specifically, Plaintiffs rely on United States v. Panhandle Eastern Corp., 118 F.R.D. 346 (D. Del. 1988), for the proposition that a defendant who fails to timely move for a protective order could not later object to production of documents based on confidentiality. See id.

I conclude that the motion is timely. The Federal Rules do not set a date certain in which to file a motion for a protective order. See Fed. R. Civ. P. 26(c) (governing protective orders). Moreover, the requirement set forth in Rule 26(c) that the moving party "include a certification that [it] in good faith conferred or attempted to confer with

---

the production by AWC.

6

other affected parties in an effort to resolve the dispute without court action" implies a flexible time frame in which to seek a protective order. Here, Plaintiffs sent discovery requests to Defendants on September 11, 2009, and AWC responded with objections and assertions of privilege to which Defendants disagreed. As previously explained, Plaintiffs' counsel thereafter contacted my chambers by letter seeking to resolve the parties' discovery dispute consistent with Judge Gardner's informal dispute resolution procedure. Counsel for AWC also contacted chambers, both to ask how the court wished to proceed on defense counsel's letter, and to inform the court that it was prepared to file a formal motion for a protective order. In response, my staff instructed AWC's counsel to refrain from filing a formal motion until after I had ruled on the parties' discovery dispute during a planned teleconference, which occurred on November 20, 2009. During that conference I ruled on the merits of AWC's objections to Plaintiffs' discovery requests, and counsel for AWC stated that they had prepared a motion for a protective order that would cover all discovery categories discussed during the conference. AWC filed the present motion on November 23, 2009, in compliance with the deadline stated during the teleconference and memorialized in my Order dated November 20, 2009. See Docs. 56, 57.

In sum, AWC delayed filing the present motion as part of an effort to informally resolve the parties' discovery dispute, and complied with the subsequent court-ordered filing deadline. Therefore, I find that the present motion is timely.[6]

## III. DISCUSSION

### A. Applicable Law

It is axiomatic that a trial court has broad discretion to fashion discovery orders. See Florsheim Shoe Co., Div. of Interco, Inc. v. United States, 744 F.2d 787, 797 (Fed. Cir. 1984) ("Questions of the scope and conduct of discovery are, of course, committed to the discretion of the trial court."). Motions for a protective order are governed by Rule 26(c) of the Federal Rules of Civil Procedure, which provides that "[a] party or person from whom discovery is sought may move for a protective order," and authorizes the court, for good cause shown, to issue a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c); see also Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994) ("In the context of discovery, it is well-established that a party wishing to obtain an order of

---

[6]Moreover, although the discovery deadline set by Judge Gardner in this case (January 15, 2010) has now passed, he has given me the authority to rule upon Plaintiffs' pending motion to extend discovery (Doc. 60), and AWC's response thereto (Doc. 63), which will be addressed by separate Order filed this day. With the discovery motions thus addressed, the parties are advised that discovery is expected to proceed without further delay.

protection over discovery material must demonstrate that 'good cause' exists for the order of protection.").

The Third Circuit has enunciated a non-exhaustive list of factors that trial courts may consider in determining whether "good cause" exists:

1) whether disclosure will violate any privacy interests;

2) whether the information is being sought for a legitimate purpose or for an improper purpose;

3) whether disclosure of the information will cause a party embarrassment;

4) whether confidentiality is being sought over information important to the public health and safety;

5) whether the sharing of information among litigations will promote fairness and efficiency;

6) whether a party benefitting from the order of confidentiality is a public entity or official; and

7) whether the case involves issues important to the public.

Glenmade Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995) (citing Pansy, 23 F.3d at 787-91).

As the non-exhaustive list suggests, the question of good cause necessarily requires a balancing of competing interests. In this regard, the Third Circuit has explained that

the court, in its discretion, is authorized by [Rule 26(c)] to fashion a set of limitations that allows as much relevant material to be discovered as possible, while preventing unnecessary

> intrusions into the legitimate interests – including privacy and
> other confidentiality interests – that might be harmed by the
> release of the material sought.

Pearson v. Miller, 211 F.3d 57, 65 (3d Cir. 2000). Thus, "[i]t is appropriate for courts to

order confidentiality to prevent the infliction of unnecessary or serious pain on parties

who the court reasonably finds are entitled to such protection." Pansy, 23 F.3d at 787.

The party seeking a protective order bears the burden to establish good cause,

which requires more than mere allegations of unspecified, theoretical or generalized

harm. See Fed. R. Civ. P. 26(c); Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121

(3d Cir. 1986) ("The party seeking the protective order must show good cause by

demonstrating a particular need for protection. Broad allegations of harm,

unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule

26(c) test."). For example, because the "release of information not intended . . . for

public consumption will almost always have some tendency to embarrass," a party

moving for a protective order on the basis of embarrassment "must demonstrate that the

embarrassment will be particularly serious." Cipollone, 785 F.3d at 1121.

Rule 26 also sets out a non-exhaustive list of protective orders than can be issued,

such as limiting the scope of a disclosure, prescribing different discovery methods,

designating who may be present while the discovery is conducted, sealing a deposition, or

prohibiting disclosure altogether. See Fed. R. Civ. P. 26(c)(1)(A)-(H). Thus, courts have

discretion to choose an appropriate order based on the particular interests requiring protection. As has been noted, because

> [i]t is impossible to set out in a rule all of the circumstances that may require limitations in discovery, or the kinds of limitations that may be needed[,] . . . [t]he rules . . . permit the broadest scope of discovery and leave it to the enlightened discretion of the district court to decide what restrictions may be necessary in a particular case.

8A Charles Allen Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2036 (2d ed. 2009).

With these standards in mind, I turn to AWC's motion.

## B.     Type of Protective Order Sought by AWC

In its motion pleadings and at oral argument, AWC asserts that the protective order it proposes is limited in that it does not prohibit discovery, but rather limits its use. See Doc. 57 at 7-12; N.T. 10/22/10 at 9-10, 50-53. AWC's nine-page proposed order (plus non-disclosure agreement) envisions the parties' ability to designate "confidential" any item of discovery not already made public, and then provides that such items "shall be used . . . solely for the prosecution or defense of this litigation." See Doc. 57, Proposed Order.[7] AWC has not identified any case in which a federal court has issued the precise type of protective order it contemplates, nor have Plaintiffs identified a case in which

---

[7]At oral argument, AWC clarified that the only information in seeks to redact from the material is patient names. See N.T. 01/22/10 at 9. Plaintiffs do not oppose the redaction of patient names, unless they are potential defense witnesses. See Doc. 58 at 10 n.2.

such a protective order was deemed improper. In any event, I conclude that a protective order designating materials as "confidential" (or "subjective to protective order"), and thus limiting use of the materials to the present lawsuit, is well within the court's discretionary power over discovery. See Fed. R. Civ. P. 26(c); Pearson, 211 F.3d at 65; Federal Practice and Procedure § 2036.

As an alternative to the protective order sought by AWC, counsel for Plaintiffs suggested at oral argument that AWC should be required to seek Plaintiffs' agreement to confidentiality as to each document it believes is highly sensitive, and that the parties would seek court intervention only if the parties disagreed. See N.T. 01/22/10 at 36. In the interest of certainty and judicial efficiency, however, I will proceed to address the protective order sought by AWC as it relates to discrete categories of materials set forth in AWC's Index. Specifically, during oral argument, the parties agreed with my assessment that the Index contains materials that fall into one of five categories: (1) documents internal to AWC, including communications among AWC staff and volunteers, (2) documents containing or referencing communications between AWC staff or volunteers and the City Defendants and/or other government entities, (3) documents containing or referencing communications between AWC staff or volunteers and third parties (such as Planned Parenthood), (4) photographs and (5) videotapes. I will first address the merits of AWC's motion for a protective order generally, and then consider the motion with respect to the individual categories.

## C.    Merits of AWC's Motion for Protective Order

Defendant AWC argues that it is entitled to a protective order because the information sought by Plaintiffs in discovery implicates privacy and security interests of AWC staff, volunteers and patients and, if used improperly, "could impact the safety of those affiliated with the [AWC]." Doc. 57 at 9. Plaintiffs counter that AWC has failed to make the requisite specific showing that the information sought implicates privacy, safety or security concerns. Doc. 58 at 2, 8-13. Plaintiffs further argue that AWC's proposed protective order is overly broad and "would allow [it] to designate 'confidential' practically the entire record created in discovery," including documents and information already obtained in discovery from the City Defendants. Id. at 2.

In support of its motion, AWC submits a declaration from Defendant Boulanger which contains specific averments of past conduct by the three named Plaintiffs in this case which allegedly amounted to harassment and intimidation of patients, staff and volunteers of AWC. See Boulanger Decl. attached to Doc. 57 as Ex. A. For example, Plaintiff Kathleen Kuhns allegedly picketed in front of Ms. Boulanger's home and distributed fliers to Ms. Boulanger's neighbors exhorting them to tell her to quit her job and threatening to contact the pastor of her church in order to have him do the same. See id. at ¶ 4. Plaintiff Kathleen Teay allegedly taunted AWC escorts by telling them she had a "plant" inside the clinic, implying she used payments from the Arietta II settlement to pay for private investigators, and calling employees, including a clinic doctor, by their

13

first names. See id. at ¶¶ 6-7. Plaintiff Joyce Mazalewski allegedly followed an AWC patient from the clinic to the grocery store where she worked in order to speak with her, provoked a conflict outside the clinic with another patient's mother, conspicuously left unattended bags outside the clinic door or parking lot (thereby suggesting bomb threats), befriended a mail carrier in order to examine AWC mail, and made remarks to an AWC employee about a painful death in her family. See id. at ¶¶ 9-13. In addition, AWC avers that Plaintiffs have ties to non-party anti-abortion protesters, one in particular (Mr. John Dunkle) who has espoused the use of deadly force against abortion providers. See id. at ¶¶ 5, 8. The obvious implication of these averments is that the plaintiffs in this case would use information obtained in the present lawsuit to engage in similar conduct in the future, and/or would provide the information to allies in the culture war who espouse more violent tactics.

If AWC were seeking an order preventing discovery of certain items, I would conclude that it had made an insufficient showing, for two reasons. First, Plaintiffs submitted declarations by all three named plaintiffs in which they either deny the averments contained in the Boulanger Declaration regarding their past conduct, or provide benign explanations for the conduct. See Kuhns Decl., Teay Decl. & Mazalewski Decl., attached to Doc. 58. For example, all three plaintiffs declared that they never sought to threaten or intimidate anyone, that their conduct at all times involved protected activity consistent with their work as pro-life "sidewalk counselors," and that in any event

14

personal information about Boulanger and her activities are a matter of public record (including appearances on national television). See Kuhns Decl. at ¶¶ 3-4, 9; Mazalewski Decl. at ¶¶ 2, 5-6, 9, 21; Teay Decl. at ¶ 3, 7-8. Plaintiff Teay declared that she did not improperly obtain "confidential" information, but rather learned personal information about AWC personnel, including the identity of a doctor, from two former AWC employees "who were converting to being pro-life and anti-abortion." Teay Decl. at ¶ 6. Similarly, Plaintiff Mazalewski declared that she learned of a doctor's identity from former AWC workers, learned that a patient worked in a grocery store because the patient told her, knew the identity of a second patient because she was a long-time friend of Ms. Mazalewski's daughter, and learned about a death in an AWC employee's family through a link to AWC's public website. See Mazalewski Decl. at ¶¶ 8-10, 19-20. Plaintiff Mazalewski further declared that she routinely carried a bag containing pro-life literature, sunscreen and insect repellant, but that she never intended for the bag to be construed as threatening. See id. at ¶¶ 15-20. Moreover, Plaintiff Mazalewksi denied any role in the composition or mailing of letters by Mr. Dunkle, while Plaintiff Kuhns specifically disavowed many aspects of Mr. Dunkle's ideology and methods and stated that she would not give personal information to anyone. See Kuhns Decl. at ¶¶ 8-9; Mazalewski Decl. at ¶ 9. In short, the competing declarations submitted by the parties create a she-said, she-said dilemma regarding Plaintiffs' past conduct, a dilemma that is not helpful in

determining whether any of the discovery sought by Plaintiffs should be protected on the basis of confidentiality.

The second problem with the averments made by AWC in their brief and in the Boulanger Declaration is that the vast majority of Plaintiffs' past conduct – namely, picketing, holding signs, sending letters, distributing fliers, and various forms of verbal communication in public fora – are activities protected by the First Amendment, however upsetting they may be from the perspective of the patients, staff and volunteers of AWC. See, e.g., Shenck v. Pro-Choice Network of West. New York, 519 U.S. 357, 377 (1993) ("Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment . . . .") (citations omitted). Just as it is difficult to see how information can be deemed "confidential" if it is readily available in the public domain (via public records, Internet postings or first-hand observation), it is equally difficult to see how information can be deemed "confidential" when the activities one seeks to prevent by that designation are constitutionally permissible.

However, the protective order at issue would not permit AWC to withhold any discovery. Rather, as previously explained, AWC seeks to limit Plaintiffs from using discovery materials for any purpose beyond this lawsuit. In this context, AWC contends that the information sought by Plaintiffs in discovery is not intended to support the claims of conspiracy and public nuisance at issue in the present lawsuit, but rather to further Plaintiffs' pro-life/anti-abortion cause in general by providing information which could be

utilized in such a way as to harass, intimidate, embarrass and/or provoke the patients, staff and volunteers of AWC. Whether or not Plaintiffs have any such intention, I agree the risk of such use is sufficient to justify the limited protection requested as to some portion of AWC's documents. Both the history of litigation involving the protesters' activities outside AWC, and the every-day, face-to-face encounters on Keats Street as alleged in the Complaint, suggest that the parties' relationship is an uneasy one that should not be made any more difficult by the court. Thus, despite the lack of any specific history of misuse by Plaintiffs of discovery prepared by AWC,[8] it appears eminently reasonable to limit the parties' use of materials they would not otherwise possess to this litigation.

A court cannot ignore the likelihood that information gleaned from discovery in this case could be used in ways not directly related to the present lawsuit, or could be shared with individuals not involved in the present lawsuit, and perhaps used in unforeseeable ways. The latter possibility touches upon one of the factors set forth in Glenmade Trust Co., 56 F.3d at 483, namely whether the information is being sought for a legitimate purpose or for an improper purpose. Also, some of the information sought by Plaintiffs implicates other factors enumerated by the Third Circuit, including privacy, embarrassment and public health and safety. See id.; see also Pearson, 211 F.3d at 65 (protective order may be imposed "where necessary 'to protect a party . . . from

---

[8]As AWC was not a party in the previous Arietta cases, there is little discovery history between these parties.

annoyance [or] embarrassment . . . .'") (quoting Rule 26(c)). When viewed through this lens, I conclude that the averments set forth in the Boulanger Declaration regarding specific past actions of anti-abortion protesters, as well as the effect these actions have had on AWC staff, volunteers and patients, satisfies the particularity requirement with respect to the limited protective order in question.

According to AWC, Plaintiffs have stated that they would not agree to any confidentiality provision or to limit their use of discovery to this litigation. See Doc 57 at 3. Apart from the sufficiency of AWC's showing, Plaintiffs' primary objection appears to be that a confidentiality or protective order, including the mechanism set forth in AWC"s proposed order, would be unworkable or difficult to enforce and would place them at risk of being sanctioned for an unintentional violation. See Doc. 58 at 12-13; N.T. 01/22/10 at 35.[9] I agree that AWC's proposed order is unnecessarily convoluted and could prove unwieldy. However, if an order can be fashioned that is sufficiently clear to be readily enforced, Plaintiffs' concerns should be allayed. Moreover, Plaintiffs' counsel conceded at oral argument that a limitation on use of certain discovery items to the litigation would not hinder Plaintiffs' ability to try their case. See N.T. 01/22/10 at 35-36. Therefore, upon consideration of the arguments made in the parties' briefs and in oral argument, and

---

[9]Plaintiffs' counsel also argued that AWC's pursuit of the protective order was "silly" because AWC had already "disclosed voluntarily tons of other information," including information similar to that which it now seeks to limit. N.T. 01/22/10 at 40-45. As this memorandum opinion makes clear, information otherwise disclosed shall not be made subject to this protective order.

18

after balancing the factors enunciated in <u>Glenmade Trust Co.</u> and the burdens created by a protective order, I conclude that AWC is entitled to have certain materials made subject to protective order and thus limited to use in the present litigation. Therefore, I will grant AWC's motion in part and deny it in part, consistent with the following:

### 1. Documents Internal to AWC

A significant portion of AWC's Index includes documents, particularly e-mails, which are internal in nature, meaning that they were generated by and for AWC staff members and/or volunteers. I conclude that these internal documents contain information which implicates privacy concerns relating to AWC patients, volunteers and/or staff, as well as security concerns (such as safety protocols and action plans). Therefore, I will grant AWC's motion for a protective order as to this category of documents and allow AWC to designate any such document "subject to protective order." For purposes of this Memorandum and Order, "subject to protective order" shall mean that the material so designated is limited for use in this litigation only, cannot be copied or reproduced in any way, cannot be published in print or on the Internet, and must be returned to AWC at the conclusion of this litigation. Because Plaintiffs are represented by two attorneys of record (Mr. Brenan and Mr. Ferrara), AWC shall provide two copies of all documents designated "subject to protective order" in their production.[10]

---

[10]I will address separately, if necessary, AWC's request to designate as confidential certain portions of deposition transcripts, and I will hold a telephonic conference to assist the parties in scheduling depositions.

## 2. AWC Documents Sent To or Received From the City Defendants and/or Other Government Entities

A smaller portion of AWC's Index relates to items – again mainly e-mails – exchanged between AWC personnel and City Defendants or other government entities. To the extent any of these documents have already been provided by the City Defendants, obviously AWC's confidentiality argument as to those documents is moot. Indeed, AWC conceded this in their proposed order, which excludes documents otherwise provided by other parties, see Doc. 59 at 2-3 & Proposed Protective Order at ¶¶ 2, 5, and again at oral argument. See N.T. 01/22/10 at 10-11. Even if such documents have not been produced by the City Defendants, however, I find that any documents exchanged by AWC and the City Defendants, or between AWC and any other governmental entity, are not entitled to any protection. Therefore, I will deny AWC's motion for a protective order as to this category of documents.

## 3. AWC Documents Sent To or Received From Third Parties

The Index also contains documents and correspondence as between AWC and third parties such as Planned Parenthood. AWC argues that these documents should be subject to a protective order because they contain personal information, they involve strategies for dealing with protesters, and they were shared with certain outside third parties "with the expectation that they'll agree that [] is private information." N.T. 01/22/10 at 11-13. I disagree. As AWC concedes, there is no legal or formal relationship between AWC and any of the third parties in question, but merely "a common interest in

20

the context of this litigation." Id. at 12. I find that this "common interest" is insufficient to extend the protective order to the third-party documents. Therefore, I will deny AWC's motion for a protective order as to this category of documents.[11]

### 4. Photos

The Index also contains one set of photos dated September 16, 2008, and described as "Photographs of cross walk – escorts, protesters and patients (with handwritten notes)." AWC conceded during oral argument that neither the photos, nor the handwritten notes, warrant protection. See N.T. 10/22/10 at 20-22. Accordingly, this aspect of AWC's motion for a protective order is denied.

### 5. Videos

Finally, AWC's Index lists four undated videotapes, described as follows: (1) "Video Tape Given to City Solicitor to Review in May 2008," (2) "Bullies in Allentown," (3) "Keats Street Activities," and (4) "Protester Activity." Counsel for AWC stated during oral argument that AWC has not completed its review of these videos, but that the first three were created by volunteers using hand-held cameras and would in all likelihood not be subject to a protective order because they had been "publicly disclosed in one way or another." N.T. 01/22/10 at 22. For example, the first video was sent to the

---

[11]To the extent AWC has particular privacy or safety concerns regarding any of the material which I find to be not subject to protective order, AWC may file a motion requesting in camera review within five days of the date of this order. Under no circumstances may such a request serve as a reason to otherwise delay discovery in this matter.

City and the third was posted on the Internet. See id. at 22-24. The fourth video was made by AWC personnel, but is apparently unresponsive because it relates to protester activities not related to this case. Id. at 24-25, 28. Therefore, I will deny AWC's motion for a protective order as to the videos.[12]

### 6. Additional Materials

During oral argument, counsel for AWC stated that additional, more recent discoverable materials exist, but that AWC had been unable to review them for purposes of the Index. See N.T 01/22/10 at 7-9. AWC's counsel further stated that these new materials would fit into the same categories identified by the Court. See id. In light of these representations, and given AWC's ongoing obligation to provide supplemental discovery during the course of litigation, AWC shall produce these new materials along with the materials identified in the Index, consistent with this memorandum.

## IV. CONCLUSION

In sum, documents internal to AWC may be designated "subject to protective order," and their use will be limited to this litigation only. Documents sent to or received from the City Defendants and/or other government entities, documents sent to or received

---

[12]In addition to the four videos described in the Index, counsel for AWC stated that AWC possesses "fixed" surveillance cameras, but that the images from these cameras are typically over-written. See N.T. 01/22/10 at 26. AWC's counsel explained that, toward the start of the present litigation, AWC had offered Plaintiffs' counsel the opportunity to ask that surveillance video of particular dates be preserved, but that Plaintiffs' counsel had not made any such request. Id. at 26-27. Plaintiffs' counsel did not contest these averments during oral argument.

from third parties, and photographs and videotapes are not subject to a protective order. All documents produced may be redacted to conceal patient names and identifiers, unless the patient has been identified as a witness for AWC. To the extent AWC has particular concerns regarding any of the material which I find to be not subject to protective order, AWC may file a motion requesting in camera review within five days of the date of this Order. An appropriate Order follows.