Denis V. Brenan
P.O. Box 465
Newtown Square PA 19073
(610) 359-0893

Christopher A. Ferrara
(Admitted *pro hac vice*)
American Catholic Lawyers Association, Inc.
420 Route 46 East, Suite 7
P.O. Box 10092
Fairfield NJ 07004-6092
(973) 244-9895
*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

KATHLEEN KUHNS, JOYCE MAZALEWSKI,
and KATHLEEN TEAY,

                 *Plaintiffs*,

          -v.-

CITY OF ALLENTOWN, CHIEF OF POLICE
ROGER MacLEAN, both individually and in his
official capacity, ALLENTOWN WOMEN'S
CENTER, and JENNIFER BOULANGER,

                 *Defendants*.

_____

Civil Action No.: 5:08-cv-02606
  (JKG)

DOCUMENT FILED
ELECTRONICALLY

         :

---

**PLAINTIFFS' RESPONSE TO STATEMENT OF "UNDISPUTED" FACTS
BY DEFENDANTS ALLENTOWN WOMEN CENTER AND
JENNIFER BOULANGER**

---

      Plaintiffs respond to Defendants' Statement of Undisputed Facts (Document 91-1) as

follows:

      **A. Plaintiffs' Responses to AWC's Assertions With Respect to the Parties**

1.      **Plaintiffs are anti-abortion protesters who routinely appear at the Women's Center and engage in various activities to, according to the complaint, "counsel and inform expectant mothers and their companions at AWC in an attempt to persuade them not to abort their unborn children." Exhibit A, Compl. at Paragraph 19.**

The first alleged undisputed fact is denied as stated.  The plaintiffs contend that they are pro-life advocates and not "protesters."  The balance of Paragraph 1 is admitted.

2.      **Defendant Allentown Women's Center is a private health care clinic that provides reproductive health care and abortion services. Ex. A, Paragraph 15.**

The second alleged undisputed fact is admitted insofar as it avers that AWC is a private clinic that provides abortion services for a profit.  Plaintiffs are without knowledge as to what "reproductive health services" AWC may provide.

3.      **Defendant Jennifer Boulanger is the Women's Center's Executive Director. Ex. A, Paragraph 17.**

The third alleged undisputed fact is admitted.

4.      **The Women's Center is within the jurisdiction of the City of Allentown Police Department. Ex. A, Paragraph 9.**

The fourth alleged undisputed fact is admitted.

5.      **Defendant Roger MacLean is the Chief of the Allentown Police Department. Ex. A, Paragraph 8. Although he is a named defendant in this action, Chief MacLean has had only limited interaction with the Women's Center over the past several years, and his knowledge regarding the subject of this lawsuit is limited to the information provided to him in his official capacity through Allentown's City Solicitor's office and through the Assistant Chief of Police, Joseph Hanna. *See* Exhibit B, MacLean deposition excerpts at**

**34:10—34, 46:1—46:17; 58:15—58:21.**

The fifth alleged undisputed fact is admitted insofar as it alleges that Roger MacLean is the Chief of Police of the Allentown Police Department. The balance of Paragraph 5 is denied as stated in that he received information from Hanna and other police officers, as well as AWC, including Jennifer Boulanger, at various times during the pendency of this suit, as evidenced by documents produced in discovery by the City to AWC and the plaintiffs.

**6.      This litigation follows two previous federal civil rights lawsuits by anti-abortion protesters against the City of Allentown and Allentown Police Department stemming from confrontational protests at and around the entrance to the Women's Center's medical facility.** *See Arietta v. City of Allentown ("Arietta I")***, C.A. No. 04-0226 (E.D. Pa.);** *Arietta v. City of Allentown, ("Arietta II")***, C.A. No. 04-5306 (E.D. Pa.).**

The sixth alleged undisputed fact is denied as stated. It is admitted that there were previous federal civil rights lawsuits instituted by pro-life advocates against the City of Allentown and its Police Department (collectively, "the City"), but it is denied that those lawsuits stemmed from any "confrontational protests" at and around the entrance to AWC. To the contrary, those suits were precipitated by the many and varied efforts of the City and AWC to deny pro-life advocates their First Amendment rights on streets around AWC's abortion facility and their right to be free from false arrest, prosecution, intimidation, and harassment.

The conduct of the City as alleged in the complaint was at the behest of AWC and was as a result of a longstanding alliance between AWC and the City. There were forty criminal charges instituted against pro-life advocates, including several against plaintiff Kuhns, before this suit was instituted. There were no convictions. *See Arietta, et al. v. City of Allentown,* 2004 WL 1774623 (E.D.Pa. August 9, 2004) ("*Arietta I*") and the forty criminal charges. *See also*

Plaintiffs' Ex. 3, Hanna deposition, page 87, lines 3 to 5, and Ex. 10, Kuhns Affidavit in Opp.

**7.     Two of the three plaintiffs in the instant case, Kathleen R. Kuhns and Kathleen Teay, also were plaintiffs in *Arietta II*; Kuhns also was a plaintiff in *Arietta I*.**

The seventh alleged undisputed fact is admitted.

**8.     Both Kuhns and Teay signed a comprehensive Settlement Agreement and General Release ("Settlement Agreement") to which was appended a Consent Order ("Consent Order") that the Court entered as a final judgment in *Arietta II*. The Order granting the *Arietta II* plaintiffs' motion for entry of the consent order is attached in support of the Women's Center's motion for summary judgment as Exhibit C. The Consent Order is attached as Exhibit D.**

The eighth alleged undisputed fact is admitted.

**9.     In the Settlement Agreement, Plaintiffs Kuhns and Teay are identified as "Releasors" while the City of Allentown is identified as a "Releasee." The *Arietta II* Settlement Agreement and General Release, attached as Exhibit E, was appended to the City of Allentown's Response to the Women's Center's Motion to Intervene in the Arietta II litigation (see docket entry 222).**

The ninth alleged undisputed fact is admitted.

**10.     The release also extends to "all other persons acting through, under or in concert with" the City of Allentown. *See* Exhibit E, Section III, General Release.**

The tenth alleged undisputed fact is admitted.

**11.     The Consent Order created detailed rules governing the conduct of police and protesters at and around the entrance to the Women's Center. *See* Exhibit D (Consent Order).**

The eleventh alleged undisputed fact is admitted.  The Consent Judgment in *Arietta II*, (2:04-cv-05306-JKG) speaks for itself, and further recognizes plaintiffs' First Amendment right to engage in counseling, leafletting and other forms of pro-life advocacy on Keats Street and in particular alongside the crosswalk on Keats Street created under the Consent Judgment.

**12.    The Consent Order created a seven-foot-wide crosswalk spanning Keats Street, connecting the Women's Center parking lot and the entrance to the Women's Center. In addition, the Consent Order created a four-foot-wide painted walkway on Keats Street adjacent to the Women's Center's parking lot. *Id*.**

The twelfth alleged undisputed fact is admitted.

**13.    Neither the Women's Center nor Boulanger was a party to *Arietta I* or *Arietta II*.**

The thirteenth alleged undisputed fact is admitted.

**14.    The Women's Center attempted to intervene in *Arietta II* upon learning the broad outlines of the Consent Order.**

The fourteenth alleged undisputed fact is denied as stated.  Plaintiffs admit that AWC attempted to intervene in *Arietta II*, but plaintiffs are without knowledge as to what precipitated the attempt to intervene.

**15.    The City of Allentown and the individual defendants opposed the Women's Center's Motion to Intervene, as did the *Arietta II* plaintiffs.**

The fifteenth alleged undisputed fact is admitted.

**16.    The Women's Center's motion to intervene was denied. *See Arietta II*, C.A. No. 04-5306 (E.D. Pa. July 12, 2007) (docket entry 235-2), attached as Exhibit F; *see also* Ex. A, Paragraph 31.**

The sixteenth alleged undisputed fact is admitted.

**17.     The Court's opinion denying the motion to intervene stated that "[t]he existing parties' settlement agreement does not bind the Women's Center in any way with respect to possible future FACE Act or Fourteenth Amendment litigation. The Center is a non-party and will not be bound by res judicata principles." Ex. F at 44.**

The seventeenth alleged undisputed fact is denied as stated.  The Court's Opinion speaks for itself and, in part, states what is asserted in the AWC defendants' Paragraph 17.   The Opinion does not, however, contemplate a situation, post-*Arietta II*, in which AWC and the City would act jointly to vitiate the settlement by blockading the critical crosswalk with tarpaulins, bodies and noise with the City's knowledge, advice and approval.  *See*, plaintiffs' Exhibits C, D, E, G, I, K, and N in Opp. to the City's original motion for summary judgment.  By acting in concert with the City, AWC has made itself subject to the injunctive provisions of the settlement under <u>Fed. R. Civ. P.</u> 65 9(d)(2)(c), as well as being independently liable as a state actor given its joint action with the City.  *See* Plaintiffs' Memorandum of Law in Opp. to Defendants' Motion for Summary Judgment, Point II.

**18.     The Court's opinion further stated that the *Arietta II* settlement agreement "does not compel employees, patients or visitors of the Allentown Women's Center to utilize the designated crosswalk. Those affiliated with the Women's Center are free to seek passage across Keats Street in either direction *in any manner they choose.*" *Id.* at 47.**

The eighteenth alleged undisputed fact is admitted, but AWC prefers to use the crosswalk now that the City has authorized its blockage of the crosswalk with bodies, tarpaulins and noise.

**19.     Plaintiff Mazalewski, who was not a plaintiff in *Arietta II*, did not begin protesting regularly at the Women's Center until the fall of 2006, long after the complaint**

in *Arietta II* **was filed. Exhibit G, Mazalewski deposition excerpts ("Maz.") at 107:5—108:15.**

The nineteenth alleged undisputed fact is denied as stated.  It is admitted that plaintiff Mazalewski started her pro-life advocacy at AWC approximately 24 months after *Arietta II* was filed and approximately eight months before *Arietta II* was settled.

**20.    At her deposition, plaintiff Mazalewski answered "Not personally" to the question, "Are you making any claim in this lawsuit with respect to activities that occurred prior to 2006 personally?" Ex. G, Maz. Dep. at 107:3—107:6.**

The twentieth alleged undisputed fact is admitted but irrelevant. There is no claim for damages or equitable relief against the City for acts prior to 2006. Acts prior to 2006 and the *Arietta II* settlement are pleaded (as required by Supreme Court precedent) to provide part of the historical context that suggests a conspiracy between AWC and the City going back to 2003 and resuming after the *Arietta II* settlement, when AWC and the City acted jointly to prevent plaintiffs from engaging in pro-life advocacy in the crosswalk that is the only point of contact between plaintiffs and people approaching or leaving AWC.  *See e.g.,* Affidavit of Plaintiff Teay in Opp., ¶ 5 and Exhibit 1 in Opp. (video clips of AWC's interference with pro-life advocacy in the crosswalk). The only acts for which relief is sought are those occurring after the settlement, for which claims are not barred by either the settlement or the release.

**21.    Mazalewski also stated at her deposition that her purported rights were not constrained by any actions by any of the defendants prior to the settlement in *Arietta II. Id.***

The twenty-first alleged undisputed fact is denied as stated.  The allegation of the defendant and the citation to the record do not support that allegation.

**22.    Mazalewski has never been arrested in connection with her activity at the**

**Women's Center.** *See* **Ex. G, Maz. Dep. At 113:25—114:3. There is no evidence that she was forbidden to protest on Keats Street after the settlement agreement in** *Arietta II***, and she has not complained of such an action by the City. At her deposition, the only acts she was able to cite as restricting her rights is the challenged activity, which did not occur until after the crosswalk was painted on Keats Street following the settlement in** *Arietta II***.** *See* **Ex. G, Maz Dep. at 123:16—124:2; 128:19—129:3; 136:18—138:9.**

The first sentence of the twenty-second alleged undisputed fact is admitted. The second sentence of the twenty-second alleged uncontested fact is denied as stated. Although she was not forbidden to "protest" on Keats Street, her right to advocate has been constrained and restricted by the conduct of AWC and the City, which conduct conflicted with the terms of the Consent Decree Judgment and settlement. The third sentence of the twenty-second alleged uncontested fact is denied as stated. To the contrary, AWC, after the *Arietta II* Consent Judgment and settlement, continued to summon the Allentown Police Department on many occasions and the Allentown Police Department ("City") responded with alacrity to the many meritless complaints of AWC. (Plaintiffs' Ex. 9, Mazalewski Affidavit) The documents produced by the City indicate that there were approximately 130 calls for service from January 2007 to February 2010. (Plaintiffs' Ex. 5, MacLean deposition, page 54, line 7, to page 56, line 4)

**23.     The particular facts giving rise to this litigation began in November 2007, when volunteer escorts at the Women's Center had the idea of using tarps on Keats Street as a method of helping patients move through the crosswalk from the Women's Center parking lot to the door of the Center. Exhibit H, Boulanger deposition excerpts at 93:16—93:24; 96:14—96:21; 101:8—101:17.**

The twenty-third alleged undisputed fact is denied. To the contrary, the facts giving rise

to this Complaint began in approximately December, 2003 when AWC began its business at the location in question, even though acts prior to the *Arietta II* settlement are not the basis for any claim in this case for damages or equitable relief against the City.  The plaintiffs, however, admit that AWC, by and through its escorts and with the City's acquiescence, agreement, and express approval, used tarps, bodies and noise to prevent plaintiffs from exercising their First Amendment rights as secured by the Settlement Agreement and Consent Judgment in *Arietta II*. Furthermore, the primary purpose for the use of tarps by AWC was to block plaintiffs from any access to expectant mothers and their companions for purposes of counseling and leafletting. (Plaintiffs' Ex. 3, Hanna deposition, page 33, line 11, to page 35, line 18; page 36, line 2, to page 38, line 16)

**24.     In their Complaint, Plaintiffs complain not only about the use of the tarps but alleged that defendants are permitting clinic escorts, who provide support and assistance to patients entering the clinic, to accompany Women's Center patients through the crosswalk on Keats Street by forming a "human shield" around patients to prevent protesters from having "access" to them and creating "vocal noise" for the purpose of drowning out the protesters' message. *See* Ex. A, Paragraph 24.**

The twenty-fourth alleged undisputed fact is denied as stated. Plaintiffs admit that AWC, with the acquiescence, agreement, and approval of the City, uses its "escorts" to form a human shield around patients and drown out plaintiffs' message with "vocal noise," in addition to using tarps, in order to prevent plaintiffs from being able to exercise their First Amendment rights as secured by the Consent Judgment/Settlement Agreement in *Arietta II*.

**25.     The Women's Center "never received approval from the City of Allentown nor its police department to use" any of these tactics. *See* Exhibit I (City of Allentown and**

**Chief Roger MacLean's Answers and Objections to Plaintiffs' Second Set of Interrogatories, No. 10).**

The twenty-fifth alleged undisputed fact is denied.  *See* plaintiffs' Exhibits C, D, G, I, K, and N in opposition to the City's original motion for summary judgment and plaintiffs' Exhibit 3 in Opposition (Hannah Dep., page 64, line 15, to page 66, line 16) *and* Exhibit 6 in Opposition (Boulanger Dep., page 106, line 14, to page 107, line 2).   These documents and the cited testimony demonstrate the City's approval of AWC's use of the tarps as a matter of City policy or practice. In fact, Exhibit N, the minutes of the City's Police Department command meeting, even declares that "this *policy* [authorizing use of the tarps] will continue as before…"

The denial of any such approval by defendant MacLean in the testimony AWC cites as an "undisputed fact" no more supports summary judgment than any other denial of wrongdoing contradicted by material facts. *See also* Plaintiffs' Ex. 3, Hanna deposition, page 33, line 11, to page 35, line 18; page 36, line 2, to page 38, line 16; Ex. 6, Boulanger deposition, page 93, line 2, to page 94, line 9; page 106, line 14, to page 107, line 2)

**26.    The Women's Center did not obtain permission from the City of Allentown before using the tarps.**

Admitted, but immaterial. The City approved this tactic almost immediately after it began, and despite plaintiffs' oral and written complaints.  *See* record citations in response No. 25.

**27.    The City did not know of the escorts' idea to use the tarps before the tarps were used and provided no active support for those plans. Ex. B, MacLean Dep. at 58:15—58:21; see also Paragraph 28 below.**

The twenty-seventh alleged undisputed fact is denied. The allegation is not supported by the citation provided by AWC. Further, the City's active support for use of the tarps is shown in plaintiffs' Exhibits A to N in Opposition to the City's original motion for summary judgment, which comprise emails and police command minutes reflecting City approval for the tactic as analyzed in plaintiffs' memorandum of law in opposition. *See* Plaintiffs' Counterstatement of Undisputed Facts.

Further, Assistant Police Chief Hanna admits that (in addition to the emails mentioned above) he conversed with Boulanger "once or twice" regarding use of the tarps following plaintiffs' complaints about them, whereas Boulanger admits that (in addition to the emails) she had a conversation with Hanna in which he approved use of the tarps. *See* Exhibit 3 in Opposition (Hanna Dep., page 64, line 15, to page 66, line 16) *and* Exhibit 6 in Opposition (Boulanger Dep., page 106, line 14, to page 107, line 2).

**28. Assistant Chief of Police Joseph Hanna did not know when the tarps first were used on Keats Street; he and the City of Allentown only learned about the use of the tarps after November 3, 2007, when a police officer responded to plaintiff Kuhns' complaint about their use. *See* Exhibit J, Hanna deposition excerpts at 59:17—59:19; 60:18—61:4; 62:22—62:25; *see also* Exhibit K (November 3, 2007 Allentown Police Department Offense/Incident Report ("the idea of the tarps was thought up by the escorts").**

The twenty-eighth alleged undisputed fact is denied as stated. Plaintiffs question the credibility of Hanna's testimony about when he first learned about the tarps used by AWC, and note that credibility questions cannot be resolved on a motion for summary judgment. Further, the alleged fact is immaterial. The cited documents and deposition testimony show, at the very

least, that the City approved of AWC's tactics after they began and that the City, despite oral and written complaints from plaintiffs and their counsel, took no action to compel AWC to stop using the tarps or otherwise to secure the exercise of plaintiffs' First Amendment rights as guaranteed by the Consent Judgment that binds the City.

Moreover, after claiming to analyze—mistakenly, as plaintiffs contend—the legality of the use of the tarps in terms of the Pennsylvania Motor Vehicle Code, 75 Pa.C.S.A. Sections 3542 and 3543, the City allowed AWC to continue to use the tarps and did not consider whether the use of tarps violated City Code, Section 703.04, and 25 Pa.C.S.A. Section 5507—the very laws the City employed in *Arietta II* in an attempt to keep pro-life advocates off of Keats Street by charging that their presence constituted blocking of the street.

Finally, AWC's suggestion that the escorts, and not Jennifer Boulanger or AWC, were responsible for the use of tarps is false and misleading. (*See* AWC Exhibits and plaintiffs' Exhibit 6, Boulanger deposition, page 18, line 6, to page 20, line 22, and page 101, lines 10 to 22, which make it clear that Ms. Boulanger and AWC tightly controlled their escorts.)

**29.     Assistant Chief Hanna did not talk to Jennifer Boulanger about the plan to use tarps before the tarps were in use. Ex. J, Hanna Dep. at 59:21—59:23.**

The twenty-ninth alleged undisputed fact is denied as stated. Plaintiffs dispute the credibility of that allegation given the extensive oral and written communications between the City and Hanna himself on one hand, and AWC and Boulanger on the other hand. (*See, e.g.*, Plaintiffs' Exhibit 3, Hanna deposition, page 50, line 16, to page 51, line 12; page 59, line 24, to page 60, line 10; page 63, lines 1 to 24; page 65, line 1, to page 66, line 16; page 82, line 25, to page 83, line 8; page 93, lines 4 to 9; Exhibit 6, Boulanger deposition, page 63, line 20, to page 64, line 6;

page 84, line 6, to page 86, line 21; page 89, line 21, to page 90, line 7; page 104, line 14, to page

105, line 2; and page 121, line 13, to page 122, line 2)

**30.    Plaintiff Kuhns testified as follows with respect to the first day the tarps were**

**used by the escorts:**

> **…the day the tarps went up, we called, the police came that day. We told**
> **them that the tarps were erected, we would like them to take them down.**
> **And I believe the officer that came to the scene that day said I would have to**
> **check with my superiors prior to letting you know. But he made them take**
> **them down that day. Exhibit L, Kuhns deposition excerpts at 30:19—30:25.**

The thirtieth alleged undisputed fact is denied. The alleged fact is not supported by the record

cite provided by AWC.

**31.    After learning about the use of the tarps from plaintiff Kuhns' call to the**

**police, the City of Allentown investigated the use of the tarps and ultimately and**

**unilaterally concluded that the conduct did not violate any law or court order. Describing**

**the City's analysis of the challenged conduct, Assistant Chief Hanna testified:**

> **[The Allentown Police Department] was not in a position to approve or**
> **disapprove the use of the tarps. So… our involvement, our purpose was**
> **solely to see whether or not it was a violation of any statutes, any**
> **Commonwealth statutes. It was determined in a conference with the**
> **Solicitor's office that there was not. And as a result of that, we did not issue**
> **any violations- vehicle code violations…it was not our position to condone the**
> **act or refute what they were doing. Ex. J, Hanna Dep. at 67:25—68:13.**

Plaintiffs cannot admit or deny the first sentence in the thirty-first alleged undisputed fact

of AWC and question the veracity of that allegation, as plaintiffs were never advised of the

City's conclusion stated therein.

As to the second sentence of this allegation, plaintiffs deny the implicit legal conclusion

that the Police Department of the City is not in a position to approve or disapprove the use of

tarps and that the Police Department's involvement is limited solely to the enforcement of the

Motor Vehicle Code. On the contrary, as the Third Circuit has made clear in the *Startzell* decision, and as this Court has already observed in denying AWC's 12(b)(6) motion, a municipality has the right to ensure that demonstrators' access to a public forum wherein their advocacy takes place is not prevented by counter-demonstrators—especially here, where a Consent Judgment binds the City to respect the exercise of plaintiffs' First Amendment rights in the public forum of Keats Street.  *See* Plaintiffs' Mem. in Opp.,  Point II.

*See also* (i) plaintiffs' Exhibit 6, Boulanger deposition, page 106, line 15, to page 107, line 3, wherein Boulanger admitted that Hanna said that the City did not object to the use of tarps and that AWC could in fact use the tarps, (ii) plaintiffs' Exhibit 3, Hanna deposition, page 64, line 15, to page 70, line 18, which is consonant with Boulanger's testimony, and (iii) Exhibits C, D, G, I, K, and N in Opp. to the City's original motion for summary judgment.  Said testimony and documents show not only that the City was in a position to approve or disapprove of the tarps, but that the City did in fact approve their use.

**32.    After he learned about the tarps, Assistant Chief Hanna only spoke to the Women's Center "perhaps once, maybe twice" about use of tarps. Ex. J, Hanna Dep. at 66:9—66:16.**

Plaintiffs can neither admit nor deny the accuracy of the thirty-second alleged undisputed fact. (*See* plaintiffs' Exhibit 3, Hanna deposition, page 64, line 15, to page 70, line 18.) However, this admission only tends to prove plaintiffs' claim of civil conspiracy.

**33.    After the City conducted an initial analysis and concluded that the challenged activity was neither criminal nor unlawful, plaintiffs' counsel repeatedly complained to the City about the activity.**

As to the thirty-third alleged undisputed fact, plaintiffs admit that on several occasions their counsel complained to the City about the tarps. Whether those complaints were before or after the City allegedly analyzed the situation and allegedly concluded that the challenged activity was neither criminal nor unlawful is unknown to either plaintiffs or their counsel, as they were never advised of the alleged analysis until the deposition of Hanna in March 2010, whose testimony presents a credibility issue.

At any rate, Hanna's testimony is immaterial, given the City's approval of the challenged conduct once it began and despite the complaints the City admittedly received from plaintiffs' counsel.

**34.     On December 13, 2007 and December 20, 2007, Denis Brenan, counsel for the plaintiffs, wrote to the City of Allentown, complaining about the use of the tarps and summarizing repeated correspondence with the City of Allentown about the tarps. Exhibit M (December 13, 2007 letter from Denis Brenan to Robert Goldman, outside counsel for the City) and Exhibit N (December 20, 2007 letter from Denis Brenan to Jerry Snyder, City Solicitor).**

The thirty-fourth alleged undisputed fact is admitted. The letters which are Exhibits "M" and "N" speak for themselves, and also record the admission by the City's outside counsel that use of the tarps was improper and that the City would not tolerate such conduct on any other public street in Allentown.

**35.     In response to the letters, the City of Allentown considered the complaints and again analyzed the allegations in light of the *Arietta II* Consent Order.**

As to the thirty-fifth alleged undisputed fact, the plaintiffs are without sufficient knowledge to admit that the City considered their counsel's complaint in light of the *Arietta II* Consent Judgment. As noted, neither plaintiffs nor their counsel were advised of the alleged analysis.

**36.     The City concluded that if a tarp was blocking the walkway, then the Order may be violated. Exhibit O (December 21, 2007 email exchange between Joseph Hanna and Jerry Snyder).**

Denied.   The Exhibit does not state what the City "concluded" but only what City Solicitor Snyder stated. Further, Snyder states that under the Consent Judgment the plaintiffs are "allowed to walk back and forth in the 48-inch walkway" which runs along the side of Keats Street, which is not the 7-foot-wide crosswalk at issue.  This "undisputed" fact is thus both irrelevant and immaterial.

**37.     The Solicitor instructed counsel to ask Mr. Brenan for photographs and to advise that the City would continue to investigate the situation. Id.**

The thirty-seventh alleged undisputed fact is admitted in that the City asked plaintiffs' counsel for photographic evidence of the use of tarps. But, plaintiffs' counsel does not believe that he was ever advised that the City would continue to investigate the situation and, as noted, Snyder was clearly under the mistaken impression that the tarps were blocking the 48-inch walkway along the side of Keats Street, not the 7-foot wide crosswalk that traverses Keats Street and leads to the entrance to AWC.

**38.     Plaintiffs' counsel provided the City with a video tape. See Exhibit P (January 8, 2008 letter from Plaintiff Kuhns to Denis Brenan with forwarding note to Bob Goldman).**

The thirty-eighth alleged undisputed fact is admitted.

**39.     The City conducted further investigation and, as a result of the investigation, concluded that the escorts' use of moving tarps, which do not block the crosswalk, does not violate the Consent Order or any Pennsylvania Motor Vehicle Code. Exhibit Q (December 23, 2007 email exchange between Joseph Hanna and Allentown Police officers) and Exhibit R (January 7, 2008 email from Assistant Chief Joseph Hanna to Solicitor Jerry Snyder).**

The thirty-ninth alleged undisputed fact is denied in part.  Neither Exhibit "Q" nor Exhibit "R" says anything about the use of tarps not violating the Consent Judgment. Furthermore, the testimony of Hanna indicates that the tarps block only pro-life advocates, and only when expectant mothers and their companions are using the crosswalk—the very time, and in the vast majority of instances the only time, plaintiffs and other pro-life advocates can speak with expectant mothers and hand out literature advocating that the mothers reject abortion. *See* Affidavit of plaintiff Teay in Opp., ¶ 5.

The City's alleged "conclusion" that the "moving" tarps do not block the crosswalk is, plaintiffs contend, in bad faith (*see* plaintiffs' Exhibit 1) and whether the tarps violated the Pennsylvania Motor Vehicle Code is virtually, if not totally, irrelevant to whether or not the use of tarps constituted a violation of plaintiffs' First Amendment rights.

Finally, the alleged analysis, if done, was fatally flawed because there is no "crosswalk" on Keats Street near the entrance of AWC within the meaning of the Motor Vehicle Code on which the City allegedly relied to conclude that pedestrians have the right of way.  Rather, the crosswalk was specifically created under the Consent Judgment by agreement of plaintiffs, but only on condition that plaintiffs be allowed access to the crosswalk to counsel women, offer literature and otherwise engage in unobstructed pro-life advocacy vis-à-vis people approaching or leaving AWC by the same crosswalk.

**40.     Thereafter, plaintiffs' counsel again wrote to counsel for the City complaining about the challenged activity.** *See* **Exhibit S (March 17, 2008 letter from Denis Brenan to Bob Goldman).**

The fortieth alleged undisputed fact is admitted.

**41.     On January 15, 2008, plaintiffs' counsel wrote to the City's outside counsel confirming that he was "unaware of any City official who authorized or granted a privilege to [the Women's Center] with respect to using tarps on both sides of the corridor between [the Women's Center] parking lot and its abortion facility." Exhibit T (January 15, 2008 letter from Denis Brenan to Robert Goldman). Plaintiffs' counsel also state that he would "advise the court [in a private criminal dispute] that the City has neither authorized nor granted any privilege to [the Women's Center]."** *Id.*

The forty-first alleged undisputed fact is admitted in that Exhibit "T" speaks for itself. At the time of this correspondence, however, counsel for plaintiffs had not received information and confirmation from the City that the City had authorized or granted a privilege to AWC with respect to the use of tarps. Neither outside counsel for the City nor the City's Solicitor, nor Assistant Chief Hanna, had ever advised plaintiffs' counsel prior to the date of Exhibit "T" that the City had "concluded" that the use of tarps by AWC did not violate the Consent Judgment or the Motor Vehicle Code, much less that the City has actually approved this conduct as a matter of Police Department policy, as shown in Exhibit N in opposition to City's original summary judgment motion, among other documents produced in discovery.  By the time this action was filed six months later, however, it was apparent to plaintiffs and their counsel, given the City's refusal to act on their complaints, that AWC's conduct must have received City approval, which has been revealed in discovery as shown by the exhibits cited above.

42.     In Police Command Meeting Minutes, the Police Department repeatedly memorialized – over the course of two years beginning prior to the settlement in *Arietta II*—the approach to be used when dealing with the Women's Center and the protesters, including plaintiffs:

"The Women's Center on Keat[s] Street is getting letters with threats…we will continue to use a hands-off approach." Exhibit U (February 21, 2007 Command Meeting Minutes).

"A/Chief Hanna said to treat the Women's Center with a hands-off approach." Exhibit V (April 18, 2007 Command Meeting Minutes).

"All complaints will be handled on a case by case basis. The department will make arrests if warranted but does not want to be in the referee position between the two parties." Exhibit W (July 11, 2007 Command Meeting Minutes).

"The Women's Center is heating up. Protesters have filed suit against the Women's Center, APD and the City. We will investigate assaults or threats. If there is even an inference of a threat, we will investigate. We need to remain neutral. We must also talk to the protesters and get information from both sides. Be specific on the reports, get names." Exhibit X (June 25, 2008 Command Meeting Minutes).

"There was a problem at the Women's Center on Keats Street. Each incident must be handled separately. The City's position is neutral but if warranted arrests will be made on either side." Exhibit Y (March 18, 2009 Command Meeting Minutes).

The forty-second alleged undisputed fact is admitted insofar as the City memorialized its self-serving declarations of "neutrality" regarding pro-life advocates, including Exhibit "X" which was not created until after this suit was filed.

This "undisputed" fact, however, omits the crucial command meeting minutes of April 30, 2008, only a few weeks before suit was filed, in which the City announces its policy of authorizing use of the tarps, which "shall continue as before unless something life threatening happens…" *See* Exhibit N in Opp.  Moreover, in actual fact the City has failed to maintain a "neutral" position, as noted above.  And, as shown in plaintiffs' legal argument, the Third Circuit

has made it clear that a "hands-off approach" when one group of citizens is interfering with the demonstration of another in a public forum is not "neutral" police conduct, but rather a dereliction of duty—especially here, where a Consent Judgment independently obliges the City to protect plaintiffs' First Amendment rights in the relevant forum.  *See* Mem. in Opp., Point II.

Finally, none of the extracted and summarized statements contained in the AWC defendants' Exhibits "U" to "Y" negates the existence of a conspiratorial agreement or joint act between AWC and the City for purposes of AWC's liability under § 1983.

**43.     Assistant Chief Hanna testified that he had a "professional relationship with Jennifer Boulanger" in which he "understood the challenges they had in operating a business, and equally understood the passion behind the pro-life advocates." Ex. J, Hanna Dep. at 84:10—84:17.**

The forty-third alleged undisputed fact is admitted in that Hanna so testified. That allegation, however, is negated by the record, which indicates that he had a close, cozy, and personal relationship with Jennifer Boulanger, including a gift of Christmas cookies from "Jen" to "Joe."  *See* plaintiffs' Exhibit F in Opp. to City's original motion for summary judgment.  The documents show that they communicated frequently, that they addressed one another by their first names, and that Boulanger requested and received extraordinary assistance from Hanna as shown by plaintiffs' Exhibits F, G, J, K, L and N in opposition to the City's original summary judgment motion and by the record citations collated at response No. 2 in Plaintiffs' Response to the City's Statement of "Undisputed" Facts, filed simultaneously herewith.

**44.     Assistant Chief Hanna and the Police Department "tried to maintain a neutrality and disseminate that down through the ranks and to patrol officers that would be responding [at the Women's Center]." Ex. J, Hanna Dep. at 84:17—84:19.**

That Hanna so testified is admitted, but that this was actually the case is denied for all the reasons set forth above. Further, the conduct of Hanna and police officers of the Allentown Police Department indicated a decided prejudice in favor of AWC, as evidenced by:

(1) The post-*Arietta II* directions to pro-life advocates from various police officers which were inconsistent with the First Amendment, the Court's ruling in *Arietta I*, and the Consent Judgment in *Arietta II*. In that regard, among other things, police officers advised that the plaintiffs had to "keep moving" during their pro-life advocacy on Keats Street, and police officers indicated that the plaintiffs could not advocate their pro-life message on Union Boulevard;

(2) Police officers made derogatory remarks to the plaintiffs and other pro-life advocates, such as "You're a pain in the a--";

(3) Police officers responded immediately to the many frivolous complaints by AWC but, for the most part, responded in a leisurely fashion to complaints made by the plaintiffs or other pro-life advocates as to criminal misconduct or legitimately suspected criminal misconduct;

(4) Police officers refused to obtain or even view videotape evidence from AWC which would have belied AWC's complaints of misconduct and indeed have proved that AWC was continuing, as it had done since at least December 2003, to make false reports of alleged crimes;

(5) Police officers refused to compel AWC to remove snow and ice on Keats Street, Union Boulevard, and Livingston Street in accordance with City Code Section 527.05, which created hazardous walking conditions for pro-life advocates, including plaintiffs, on those streets; and

(6) The City's Police Department has refused to investigate suspected crimes such as statutory rape of, and the performance of abortions on, underage girls who did not have parental

consent for abortion. In sharp contrast, the City responded to complaints from AWC of so-called "white line" violations of the crosswalk by pro-life advocates, including plaintiff Mazalewski, who was not even bound by the Consent Judgment because she was not a party to *Arietta II* and therefore was free to exercise her First Amendment rights as recognized by *Arietta I.*

*See* Plaintiffs' Ex. 9, Mazalewski Affidavit; Ex. 10, Kuhns Affidavit.

**45.     After the Consent Order was entered, the City responded to several complaints by both protesters (including plaintiffs) and the Women's Center, but has not issued any citations either against the Women's Center or plaintiffs. Ex. J, Hanna Dep. at 86:17—87:10.**

The forty-fifth alleged undisputed fact is denied as stated. In fact, the City responded to numerous complaints by AWC and its agents after the Consent Order was entered. It is admitted that the City has not issued any citations or charges against either the Women's Center or the plaintiffs, but that proves nothing because the complaints against the plaintiffs were legally and/or factually unsupportable, but, as noted, the opposite was true with regard to complaints concerning the conduct of AWC and its agents or employees. (Plaintiffs' Exhibit 3, Hanna deposition, page 86, line 17, to page 87, line 5)

**46.     On May 16, 2008, Jerry Snyder, Allentown's City Solicitor, responded to complaints made by Jennifer Boulanger and a tape provided by the Women's Center to the Police Department depicting a compilation of multiple incidents at the Women's Center, concluding that he "would not recommend prosecution based on the evidence as compiled in this videotape." *See* Exhibit Z (May 16, 2008 letter from Solicitor Snyder to Assistant Chief Hanna). He further concluded that he would "not recommend any action on behalf of the City alleging that the protestors are in violation of the stipulation in Arietta II." *Id.***

The essence of the forty-sixth alleged undisputed fact is admitted. However, the fact that the City did not in this instance prosecute non-existent crimes against pro-life advocates does not support AWC's Motion for Summary Judgment. In fact, the letter makes no reference whatsoever to the plaintiffs.

**47.     In that letter, Solicitor Snyder also stated:**

> **as you [Assistant Chief Hanna] and I have previously discussed any evidence from either the protestors or the Women's Center of alleged criminal violations will be reviewed thoroughly…While both the protestors and Ms. Boulanger have widely divergent interests, they will be treated no differently than any other citizen of the City of Allentown, as the City is neither an advocate for the protestors nor an advocate for the Women's Center. *Id.***

As to the forty-seventh alleged undisputed fact, it is admitted that Solicitor Snyder wrote the self-serving statement quoted. But, as noted in all the previous responses, the City did not treat plaintiffs fairly or in an even-handed fashion.  The City did, however, treat AWC and Boulanger differently from plaintiffs and other similarly situated persons by favoring AWC's position, responding to its every complaint, and ultimately authorizing its total obstruction of plaintiffs' pro-life advocacy in the crosswalk that plaintiffs were induced to accept in exchange for the City's promise to allow access to the crosswalk for their advocacy.

**48.     In correspondence with Plaintiff Kuhns, Assistant Chief Hanna offered to meet with Kuhns to discuss her request for proposed guidelines at the Women's Center. Exhibit AA (June 25, 2009 email exchange between Plaintiff Kuhns and Joseph Hanna). Assistant Chief Hanna wrote "I would be very much interested in speaking with you on this matter. The police department maintains a neutral position and respects one's right to freedom of speech." Id. He further stated that "[w]e understand that emotions run high on both sides of this topic and we try to carry out our duties in a diligent and respectful way." Id.**

As to the forty-eighth alleged undisputed fact, it is admitted that *after* the litigation asserting a conspiracy was instituted, Hanna professed that the Police Department was "neutral." However, the history of the City's relationship to Boulanger and AWC on the one hand, and the plaintiffs on the other hand, shows that the City has treated the plaintiffs disparately and negatively as the previous responses and record citations demonstrate.

Dated: August 2, 2010

Respectfully submitted,

s/ Denis V. Brenan (DVB4549)
DENIS V. BRENAN, ESQ.
Pennsylvania Litigation Counsel
for AMERICAN CATHOLIC LAWYERS
 ASSOCIATION, INC.
P.O. Box 465
Newtown Square, PA 19073
Phone: (610) 359-0893
*Counsel for plaintiffs*

s/ Christopher A. Ferrara (CAF2422)
CHRISTOPHER A. FERRARA, ESQ.
(Admitted *pro hac vice*)
AMERICAN CATHOLIC LAWYERS
 ASSOCIATION, INC.
420 Route 46 East, Suite 7
P.O. Box 10092
Fairfield, NJ 07004-6092
Phone: (973) 244-9895
*Co-counsel for plaintiffs*